# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF NEW YORK

WOORI BANK,

        Plaintiff,

        v.

RBS SECURITIES, INC., f/k/a
GREENWICH CAPITAL MARKETS, INC.;
RBS HOLDINGS USA INC. f/k/a
GREENWICH CAPITAL HOLDINGS,
INC.; RBS FINANCIAL PRODUCTS, INC.
f/k/a GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC.; ACA ABS 2007-1 LLC;
ACACIA CDO 10, INC.; CAIRN MEZZ
ABS CDO II INC.; NOVASTAR ABS CDO
I, INC.; TABS 2006-6, LLC; and WEBSTER
CDO I (DELAWARE) CORP.,

        Defendants.

Civil Action No. 12 Civ. 4254 (HB)

ECF Case

**ORAL ARGUMENT REQUESTED**

# PLAINTIFF'S OPPOSITION TO THE RBS DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 3

        A.      CDO Structure ............................................................................................... 4

        B.      RBS's Alleged Misconduct ............................................................................ 5

        C.      The OCs For the CDOs At Issue .................................................................. 9

III.    ARGUMENT .............................................................................................................. 11

        A.      Standards Governing This Motion .............................................................. 11

        B.      Plaintiff Has Adequately Pled Venue ......................................................... 12

        C.      Plaintiff Has Adequately Pled Fraud ......................................................... 19

                1.      Plaintiff Has Adequately Pled Omissions Or Misrepresentations ................ 19

                2.      Plaintiff Has Adequately Pled Reliance ......................................... 28

                3.      Plaintiff Has Adequately Pled *Scienter* ......................................... 30

        D.      Plaintiff Has Adequately Pled Negligent Misrepresentation ................................. 32

        E.      Plaintiff Has Adequately Pled Unjust Enrichment ................................. 35

IV.     CONCLUSION ........................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

F<span style="font-variant:small-caps">EDERAL</span> C<span style="font-variant:small-caps">ASES</span>

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
651 F. Supp. 2d 155 (S.D.N.Y. 2009) ........................................................................ *passim*

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
No. 08 Civ. 7508 (SAS), 2012 WL 3584278 (S.D.N.Y. Aug. 12, 2012) ................................24

*Accordia Northeast, Inc. v. Thesseus Int'l. Asset Fund, N.V.,*
205 F. Supp. 2d 176 (S.D.N.Y.2002).................................................................................22

*AGCS Marine Ins. Co. v. Associated Gas & Oil Co.,*
775 F. Supp. 2d 640 (S.D.N.Y. 2011) ..............................................................................16

*Anderson News, L.L.C. v. American Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)...............................................................................12, 27

*Anwar v. Fairfield Greenwich Ltd.,*
728 F. Supp. 2d 372 (S.D.N.Y. 2010)...........................................................................20, 21

*Arrowsmith v. United Press Int'l.,*
320 F.2d 219 (2d Cir. 1963)............................................................................................14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................................11

*Assured Guar. Municipal Corp. v. UBS Real Estate Sec., Inc.,*
No. 12 CV 1579 (HB), 2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012) ...................................27

*Avila v. Lease Finance Group, LLC,*
No. 09 CV 8633, 2012 WL 3165408 (S.D.N.Y. Jul. 31, 2012)........................................ 19-20

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..................................................................................................11, 12

*Berman v. Informix Corp.,*
30 F. Supp. 2d 653 (S.D.N.Y.1998)..................................................................................18

*Caiola v. Citibank, N.A.,*
295 F.3d 312 (2d Cir. 2002)........................................................................................23, 24

*Capitol Records, LLC v. VideoEgg, Inc.,*
611 F. Supp. 2d 349 (S.D.N.Y.2009)................................................................................16

*Century Pac., Inc. v. Hilton Hotels Corp.*,
No. 03 Civ. 8258, 2004 WL 868211 (S.D.N.Y. Apr. 21, 2004)................................34

*China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc.*,
No. 06 CV 13107, 2012 WL 3101274 (S.D.N.Y. Jul. 31, 2012)...........................14

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
480 F.2d 341 (2d Cir. 1973)...............................................................................21

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991)....................................................................13

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
No. 11 Civ. 5026 JSR, 2012 WL 2866425 (S.D.N.Y. July 13, 2012)....................20

*Coty of Roseville Employees' Ret. Sys. v. Energy Solutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)..................................................................19

*Crigger v. Fahnestock & Co.*,
443 F.3d 230 (2d Cir. 2006)................................................................................28

*Dandong v. Pinnacle Performance, Ltd.*,
No. 10 Civ. 8086 (LBS), 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) ..............*passim*

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Sup. 2d 624 (S.D.N.Y. 2012)..................................................................*passim*

*Doehla v. Wathne, Ltd.*,
No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999) ............................29

*E.I. Du Pont De Nemours & Co. v. Fine Arts Reproduction Co.*,
No. 93 Civ. 2462 (KMW), 1995 WL 312505 (S.D.N.Y. May 22, 1995)...............14

*Emerald Asset Advisors, LLC v. Schaffer*,
No. 11 CV 1871, 2012 WL 3870318 (E.D.N.Y. Sept. 6, 2012).............................13

*Employees' Ret. Sys. of the Gov't of V.I. v. Morgan Stanley & Co.*,
814 F.Supp.2d 344 (S.D.N.Y. 2011).....................................................................21

*Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004)................................................................................12

*Farley v. Davis*,
No. 91 Civ. 5530 (PKL), 1992 WL 110753 (S.D.N.Y. May 8, 1992)...................22

*German v. Federal Home Loan Mortg. Corp.*,
896 F.Supp. 1385, 1400 (S.D.N.Y. 1995) ............................................................14

*Getz v. Boeing Co.,*
    547 F. Supp. 2d 1080 (N.D. Cal. 2008) ................................................................17

*Halperin v. eBanker USA.com, Inc.,*
    295 F.3d 352 (2d Cir. 2002)................................................................24

*In re AstraZeneca Sec. Litig.,*
    559 F. Supp. 2d 453 (S.D.N.Y. 2008)................................................................31

*In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.,*
    763 F. Supp. 2d 423 (S.D.N.Y.2011)................................................................27

*In re Citigroup, Inc. Sec. Litig.,*
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)................................................................4, 5

*In re Collins & Aikman Corp. Sec. Litig.,*
    438 F. Supp. 2d 392 (S.D.N.Y. 2006)................................................ 16-17

*In re Fitch, Inc.,*
    330 F.3d 104 (2d Cir. 2003)................................................................7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    618 F. Supp. 2d 311 (S.D.N.Y. 2009)................................................................24

*In re Lehman Bros. Sec. & ERISA Litig.,*
    684 F. Supp. 2d 485 (S.D.N.Y. 2010), *aff'd*, 650 F.3d 167 (2d Cir. 2011) ..............................25

*In re MTC Electronic Technologies Shareholder Litig.,*
    993 F. Supp. 160 (E.D.N.Y. 1997) ................................................................21

*In re Oxford Health Plans, Inc., Sec. Litig.,*
    187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................20

*In re Prudential Sec. Ltd. Pshps. Litig.,*
    930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................24

*Iragorri v. United Tech. Corp.,*
    274 F.3d 65 (2d Cir.2001)................................................................18

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001)................................................................31

*King County, Wa. v. IKB Deutsche Industriebank, AG,*
    No. 09 Civ. 8387 (SAS), 2012 WL 1592193 (S.D.N.Y. May 4, 2012), *recon. denied,*
    2012 WL 2160285 (S.D.N.Y. June 7, 2012) ................................................7, 8, 33, 34

*King County, Wa. v. IKB Deutsche Industriebank AG,*
    751 F. Supp. 2d 652 (S.D.N.Y. 2010) ................................................................20, 24

*Landesbank-Baden-Wurttemberg v. Goldman Sachs & Co.,*
    No. 11-4443, 2012 WL 1552590 (2d Cir. Apr. 19, 2012) .......................................................29

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,*
    951 F. Supp. 1071 (S.D.N.Y. 1996).................................................................................33

*Laureano v. Goord,*
    No. 06-cv-7845, 2007 WL 2826649 (S.D.N.Y. Aug. 31, 2007)....................................... 18-19

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006)............................................................................................31

*Maloul v. Berkowitz,*
    No. 07 Civ. 8525, 2008 WL 2876532 (S.D.N.Y. July 23, 2008) ...........................................28

*Mfrs.' Hanover Trust Co. v. Yanakas,*
    7 F.3d 310 (2d Cir.1993)..................................................................................................24

*Marine Midland Bank, N.A. v. Miller,*
    664 F.2d 899 (2d Cir. 1981)............................................................................................14

*Marisol A. v. Guiliani,*
    929 F. Supp. 662 (S.D.N.Y.1996) ......................................................................................19

*Mayor & City Council of Baltimore v. Credit Suisse Group AG,*
    No. 1:11-cv-5450 (NRB) (S.D.N.Y.)..................................................................................18

*Meijer, Inc. v. Ferring B. V.,*
    585 F.3d 677 (2d Cir.2009)..............................................................................................31

*Merrill Lynch & Co., v. Allegheny Energy, Inc.,*
    500 F.3d 171 (2d Cir. 2007).............................................................................................28

*Morris v. Ernst & Young, LLP,*
    No. 12 CV 0838, 2012 WL 3964744 (S.D.N.Y. Sept. 11, 2012) ...........................................17

*Mpower Commc'ns. Corp. v. Voipld.com, Inc.,*
    304 F. Supp. 2d 473 (W.D.N.Y. 2004) ...............................................................................18

*N.Y. Marine & Gen., Ins. Co. v. Lafarge N. Am., Inc.,*
    599 F.3d 102 (2d Cir.2010).............................................................................................16

*Network Enterprises, Inc. v. APBA Offshore Prods., Inc.,*
    No. 01 Civ. 11765 (CSH), 2002 WL 31050846 (S.D.N.Y. Sept. 12, 2002) .........................22

*New Jersey Carpenters Health Fund v. DLJ Mortg. Capital,*
    No. 08 Civ 5653 (PAC), 2010 WL 1473288 (S.D.N.Y. March 29, 2010) ............................24

*Nomura Sec. Intern., Inc. v. E\*Trade Sec., Inc.,*
    280 F. Supp. 2d 184 (S.D.N.Y. 2003).................................................................................29

*Nordwind v. Rowland,*
    584 F.3d 420 (2d Cir. 2009).................................................................................................35

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC,*
    446 F.Supp.2d 163 (S.D.N.Y. 2006).....................................................................................31

*People of the State of N.Y. ex rel. Spitzer v. Operation Rescue Nat'l,*
    69 F. Supp. 2d 408 (W.D.N.Y. 1999)............................................................................ 17-18

*Phillips v. Kidder, Peabody & Co.,*
    750 F. Supp. 603 (S.D.N.Y. 1990) ......................................................................................21

*PI, Inc. v. Quality Products, Inc.,*
    907 F. Supp. 752 (S.D.N.Y. 1995) ......................................................................................14

*Press v. Chem. Inv. Servs. Corp.,*
    166 F.3d 529 (2d Cir.1999)..................................................................................................31

*Prospect Capital Corp. v. Bender,*
    No. 09 Civ. 826 (HB), 2009 WL 4907121 (S.D.N.Y. Dec. 21, 2009) ...........................15, 16

*Richman v. Goldman Sachs Group, Inc.,*
    No. 10 Civ. 3461 (PAC), 2012 WL 2362539 (S.D.N.Y. June 21, 2012) .........................21, 25

*Rolls–Royce Motor Cars, Inc. v. Schudroff,*
    929 F. Supp. 117 (S.D.N.Y.1996) ........................................................................................22

*Ronzani v. Sanofi S.A.,*
    899 F.2d 195 (2d Cir. 1999)..................................................................................................35

*Samuels v. Air Transp. Loc. 504,*
    992 F.2d 12 (2d Cir. 1993).......................................................................................................6

*Shields v. Cititrust Bancorp., Inc.,*
    25 F.3d 1124, 1130 (2d Cir. 1994)........................................................................................31

*Sogeti USA LLC v. Whirlwind Bldg. Sys., Inc.,*
    274 Fed.Appx. 105 (2d Cir. 2008) .......................................................................................32

*Space Coast Credit Union v. Barclay's Capital, Inc.,*
    No. 11 Civ. 2802 (LLS), 2012 WL 946832 (S.D.N.Y. March 20, 2012)................................34

*Stewart Org., Inc. v. Ricoh Corp.,*
    487 U.S. 22 (1988)................................................................................................................18

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001).................................................................................................33

*Tabor v. Bodisen Biotech, Inc.,*
    579 F. Supp. 2d 438 (S.D.N.Y. 2008)..............................................................................35

*United Feature Syndicate v. Miller Features Syndicate, Inc.,*
    No. 01 Civ. 2491 (GEL), 2002 WL 389155 (S.D.N.Y. March 11, 2002) ..............................22

*Wedbush Morgan Sec., Inc. v. Robert W. Baird & Co.,*
    320 F. Supp. 2d 123 (S.D.N.Y. 2004)..............................................................................30

*Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.,*
    247 F. Supp. 2d 352 (S.D.N.Y. 2002)..............................................................................34

*Wexner v. First Manhattan Co.,*
    902 F.2d 169, 172 (2d Cir.1990).....................................................................................31

*Williams v. City of New York,*
    No. 05 Civ. 10230 (SAS), 2007 WL 2214390 (S.D.N.Y. July 26, 2007) ..............................29

*Wynn v. A.C. Rochester,*
    273 F.3d 153 (2d Cir. 2001)............................................................................................19

**STATE CASES**

*ACA Fin. Guar. Corp. v. Goldman Sachs & Co.,*
    No. 6500027/11, 2012 WL 142564 (N.Y. Sup. Apr. 23, 2012) ............................................26

*China Dev. Indus. Bank v. Morgan Stanley & Co.,*
    86 A.D.3d 435, 927 N.Y.S.2d 52 (1st Dep't 2011) ......................................................26, 30

*DDJ Mgmt., LLC v. Rhone Group, L.L.C.,*
    15 N.Y.3d 147, 931 N.E.2d 87, 905 N.Y.S.2d 118 (N.Y. 2010) ............................................28

*Houbigant, Inc. v Deloitte & Touche,*
    303 A.D.2d 92, 753 N.Y.S.2d 493 (1st Dep't 2003) ..............................................................31

*HSH Nordbank AG v. UBS, AG,*
    95 A.D.3d 185, 941 N.Y.S.2d 59 (1st Dep't 2012) ......................................................29, 30

*Kimmell v. Schaefer,*
    89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996).................................................32

*Lederer v. King,*
    214 A.D. 2d 354, 625 N.Y.S.2d 149 (1st Dep't1995) ..............................................................20

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.,*
    68 A.D.3d 1747, 891 N.Y.S.2d 578 (4th Dep't 2009)...........................................................26

*MBIA Ins. Co. v. Countrywide Home Loans, Inc.,*
  87 A.D.3d 287, 928 N.Y.S.2d 229 (1st Dep't 2011) ................................................25, 30

*MBIA Ins. Co. v. Residential Funding Co., LLC,*
  26 Misc.3d 1204(A), 2009 WL 5178337 (N.Y.Sup. Dec. 22, 2009)........................26

*MBIA Ins. Co. v. Royal Bank of Canada,*
  28 Misc.3d 1225(A), 2010 WL 3294302 (N.Y.Sup. Aug. 19, 2010) ......................26

*Parrott v. Coopers & Lybrand,*
  95 N.Y.2d 479, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000)....................................33

*Rotella v. Derner,*
  283 A.D.2d 1026, 723 N.Y.S.2d 801 (4th Dep't 2001)...........................................20

*Scharf v. Tiegerman,*
  166 A.D.2d 697, 561 N.Y.S. 2d 271 (2d Dep't 1990) .............................................27

*Sec. Investor Protection Corp. v. BDO Seidman,*
  95 N.Y.2d 702, 723 N.Y.S.2d 750, 746 N.E.2d 1042 (2001)..................................32

*Sheridan Drive-in, Inc. v. State,*
  16 A.D.2d 400, 228 N.Y.S. 2d 576 (4th Dep't 1962) .............................................28

*Silver Oak Capital L.L.C. v UBS AG,*
  82 A.D.3d 666, 920 N.Y.S.2d 325 (1st Dep't 2011) ...............................................25

*Steinhardt Group Inc. v Citicorp,*
  272 A.D.2d 255, 708 N.Y.S.2d 91 (1st Dep't 2000) ...............................................25

*Tahini Investments, Ltd. v. Bobrowsky,*
  99 A.D.2d 489, 470 N.Y.S.2d 431 (2d Dep't 1984) ...............................................25

*Viking Global Equities, L.P. v. Porsche Automobil Holding SE,*
  No. 650435/11, 36 Misc.3d 1233(A), 2012 WL 3640864 (N.Y. Sup. Aug. 6, 2012) .......25, 30

*Von Au v. Magenheimer,*
  126 A.D. 257, 110 N.Y.S. 629 (2d Dep't. 1908) ....................................................28

**FEDERAL STATUTES**

28 U.S.C. §§ 1391(b)(1) and (2) ...................................................................................1, 14

28 U.S.C. § 1392(b) ................................................................................................12, 14, 16

28 U.S.C. § 1404(a) ................................................................................................1, 16, 17

**STATE STATUTES**

C.P.L.R. §§ 302(a) and (a)(2) ..................................................................................13

**RULES**

Fed. R. Civ. P. 9(b) ...........................................................................1, 12, 19, 22

Fed. R. Civ. P. 15(a)(2)..................................................................................35

Fed. R. Civ. P. 21 ..........................................................................................14

**OTHER AUTHORITIES**

FCIC Preliminary Staff Report, *Credit Ratings and the Financial Crisis*
    (June 2, 2010), http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0602-
    Credit-Ratings.pdf.......................................................................... 9-10

Federal Reserve Bank of New York, *New York Fed Responds to Congressional Request*
    *for Information on Barclays – LIBOR Matter*, (July 13, 2012),
    http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matte
    r.html.....................................................................................15

Letter from Paul T. Bossidy, Chief Executive Officer of, Clayton, to Phil Angelides,
    Chairman of the FCIC (Sept. 30, 2010),  http://graphics8.nytimes.com/packages/pdf/
    opinion/Clayton-FCIC.pdf .............................................................6

SEC, *Report on the Role and Function of Credit Rating Agencies in the Operation of the*
    *Securities Markets* (Jan. 2003),
    http:// www.sec.gov/news/studies/creditratingreport0103.pdf ..................8

Senate Permanent Subcommittee on Investigations of the Senate Committee on
    Homeland Security and Governmental Affairs, 112th Cong., *Wall Street and the*
    *Financial Crisis: Anatomy of a Financial Collapse*
    (Apr. 13, 2011)............................................................................8

U.K. Financial Services Authority Board Report, *The Failure of the Royal Bank of*
    *Scotland* (Dec. 2011), http://www.fsa.gov.uk/pubs/other/rbs.pdf ...............5, 6

U.S. Office of the Comptroller of the Currency, *Asset Securitization: Comptroller's*
    *Handbook* (Nov. 1997), http://www.occ.gov/publications/publications-by-
    type/comptrollers-handbook/assetsec.pdf ...........................................7

## I.   __INTRODUCTION__

Plaintiff Woori Bank ("Woori" or "Plaintiff") hereby opposes the RBS Defendants'[1]

motion to dismiss the "Amended Complaint" (Aug. 20, 2012) (Dkt. No. 59) ("Compl." or

"Complaint") in this case.

RBS contends initially that the Complaint should be dismissed because venue in this

district is not pled adequately under 28 U.S.C. §§1391 (b)(1) and (2) and, alternatively that the

case should be transferred to the District of Connecticut under 28 U.S.C. §1404(a). "The RBS

Defendants' Memorandum of Law In Support Of Their Motion To Dismiss The Amended

Complaint Or Transfer This Action Pursuant To 28 U.S.C. §1404(a)," pp. 9-13 (Sept. 12, 2012)

(Dkt. No. 66) ("Defs' Mem."). RBS next contends that: (a) Woori has failed to plead fraud with

the particularity demanded by Fed. R. Civ. P. 9(b); (b) Woori has not demonstrated reasonable

reliance because it was a "sophisticated investor"; (c) Woori has failed to allege a single

actionable misstatement or omission; (d) Woori has failed to allege facts demonstrating *scienter*;

and (d) Woori has failed to allege facts demonstrating loss causation. *Id.*, pp. 13-33. None of

these arguments is well-founded. It also contends that Plaintiff has inadequately pled claims for

negligent misrepresentation and unjust enrichment. *Id.*, pp. 33-34.

Woori bought $80 million worth of notes in a total of six collateral debt obligations

("CDOs") marketed by RBS between August 3, 2006 and March 8, 2007—ACA ABS 2007-1

("ACA"), Acacia CDO 10 ("Acacia"), Cairn Mezz ABS CDO II ("Cairn Mezz"), Novastar ABS

CDO I ("Novastar"), TABS 2006-6 ("TABS") and Webster CDO I ("Webster"). Compl., ¶¶8-12.

Woori has alleged numerous material misstatements or omissions. These allegations involve,

---

[1] The motion is filed on behalf Defendants RBS Securities, Inc. ("RBSS"), RBS Holdings USA Inc. ("RBSH"), and RBS Financial Products, Inc. ("RBSFP"). These three entities will be referred to collectively in this pleading as "RBS" or "Defendants." They formerly operated under the "Greenwich Capital" moniker. Compl., ¶¶14-16.

*inter alia*: (a) the recognition by the Royal Bank of Scotland plc's ("Royal Bank") Global

Banking & Markets ("GBM") Division (which directed the activities of the RBS Defendants

named in the Complaint) by the latter part of 2006 that it faced significant adverse sub-prime

market exposure, exposure that it publicly denied having (*id.*, ¶¶50-52, 55); (b) GBM's decision

in January of 2007 to have the RBS Defendants here go ahead and sell interests in five

uncompleted CDOs (including Novastar and ACA), even though it was aware that the market for

them had deteriorated badly and it could not even unload the super-senior tranches in them (*id.*,

¶55); (c) RBS's failure to disclose that it "waived" in mortgage loans used to form the

Residential Mortgage-Backed Securities ("RMBS") that were the collateral for its CDOs even

though those loans failed to satisfy its applicable underwriting standards (*id.*, ¶¶62-70); (d)

RBS's  practices of providing false information to ratings agencies with the goal of obtaining

inflated ratings and pressuring such agencies to provide such ratings (*id.*, ¶¶72-79, 85-86); (d)

RBS's failure to disclose that the London Interbank Offered Rate ("LIBOR") used to compute

the interest on the CDOs sold to Woori was manipulated by a cartel that included Royal Bank

and its U.S. subsidiaries, including RBS (*id.*, ¶¶28, 88-103); (e) false statements attributable to

RBS in the Offering Circulars ("OCs") of the CDOs at issue that no material information was

omitted (*id.*, ¶¶108-09 (p. 44), 113-14, 123-24, 133-34, 142-43); (f) the inclusion in the OCs of

materially misleading charts concerning break-even default scenarios (*id.*, ¶¶111 (p. 44), 115,

125, 128-29, 135, 144, 153); (g) false statements that RBS could act as a market maker should

Woori want to resell the notes it bought (*id.*, ¶¶112 (pp. 45-46), 147); (h) the provision of

materially misleading credit ratings in the OCs (*id.*, ¶¶105-06 (p. 46), 116-18, 126-27, 136-38,

145-46, 148-49, 154-57); (i) false statements in certain OCs that the collateral manager would

exercise the proper "due care" and "skill" in selecting the collateral for them or would obtain

them on an "arm's length" basis (*id.*, ¶¶107-10 (pp. 46-47), 120); and (j) certain misleading oral statements by an RBS representative in connection with Woori's investment in Novastar (*id.*, ¶ 139).

Woori has also pled *scienter* adequately. *Id.*, ¶¶3, 54-55, 59, 62-63, 65, 70, 96-99, 100, 105-06 (p. 46), 112, 115, 119, 125, 130, 138, 144, 148-49, 153, 155, 162, 170. The foregoing allegations involve internal practices at RBS of which it had unique knowledge and of which Woori had none until the truth was disclosed by regulators. *Id.*, ¶¶40, 92-95.

Reasonable reliance is also pled. *Id.*, ¶¶4, 41-43, 105 (p. 46), 108 (p.46), 111 (pp. 47-48), 112, 116, 118, 128, 130-31, 136, 138, 147-48, 157, 165, 172. Woori was not a "sophisticated investor" and relied on RBS to apprise it of the full facts regarding the CDOs in which it invested. *Id.*, ¶¶40, 42, 45, 56, 87. The presence of boilerplate disclaimers in the OCs does not undermine this conclusion. But even if Woori were deemed to be a sophisticated investor, it could not have found out about RBS's secret schemes and clandestine internal plans, and it should be allowed to pursue its claims. *Id.*, ¶44.

Woori has also sufficiently pled negligent misrepresentations. RBS owed it a duty of disclosure based on RBS's superior knowledge of, and selective misleading disclosures of the risks underlying, the CDOs in question. *Id.*, ¶¶169-73. These included nondisclosures of its own conduct that caused the six CDOs in question to be likely candidates for failure.

Finally, Woori has adequately pled a claim for unjust enrichment arising from RBS's tortious conduct. *Id.*, ¶¶177-78.

For all of the foregoing reasons, RBS's motion to dismiss should be denied.

## II.    **FACTUAL BACKGROUND**

3

A.    **CDO Structure**

The structure of the deals at issue has been explained in the report of the Financial Crisis

Inquiry Commission issued in January of 2011 ("FCIC Report") and at paragraphs 30-33 of the

Complaint. *See also In re Citigroup, Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 214-15 (S.D.N.Y.

2010) ("*Citigroup*"). CDOs are created when an underwriter or structurer purchases a pool of

assets and transfers them to a special purpose entity. The entity then issues debt securities, the

interest payments for which are supported by the income stream generated by the entity's

assets. The assets often include other securities, including RMBS. RMBS are created when an

underwriter buys a large package of residential mortgages and transfers them to a special

purpose entity that issues securities collateralized by the mortgages. The typical structure of an

RMBS is depicted on page 10 of the Complaint. CDOs are divided into tranches, the typical

structure of which is depicted on page 11 of the Complaint. The "super senior" tranches are

typically rated "AAA" by the ratings agencies and were perceived to have the least risk.  With

respect to CDOs marketed by RBS, the super senior tranches were often held by RBS. Compl.,

¶55.  The lowest-rated and most risky tranche was called "equity". Woori invested in

mezzanine tranches typically rated "A" or "A-", which were viewed as non-speculative

investment-grade securities. *Id.*, ¶34. Woori made these investments based in part on these

ratings and on presentations made by RBS salespeople. *Id.*, ¶¶37-39, 43, 149 & Exh. A.

RBS structured and marketed the CDOs at issue here as well as many of the RMBS that

served as collateral for them. *Id.*, ¶¶43, 47, 55. It also held unsold CDOs that it repackaged as

collateral for new CDOs. *Id.*, ¶110 (p. 47). RBS had a massive sales force that engaged in a

global marketing blitz to sell its CDOs. *Id.*, ¶47. Not only did it pocket fees generated by every

step of this process, but, given its role in the mortgage origination, RMBS and CDO markets, it

4

had a depth of knowledge no investor (and certainly not Woori) could match. *See Citigroup*,

753 F. Supp. 2d at 237 (finding that a CDO's underwriter "is in the best position to recognize

the threats the [CDOs] faced...."); *Dandong v. Pinnacle Performance, Ltd.*, No. 10 Civ. 8086

(LBS), 2011 WL 5170293 at *11 (S.D.N.Y. Oct. 31, 2011) ("*Dandong*") (same).

The issuers of the six CDOs in question were basically mail drops formed by RBS with

no employees, nominal capitalization, and no prior operating history. *Id.*, ¶¶19-23, 60. Its name

appears on every one of the OCs in question. *Id.*, ¶17. Thus, statements made by the issuers for

the CDOs in question are fairly attributable to RBS. *Id.*, ¶¶109, 114, 124, 134, 143.

**B.     RBS's Alleged Misconduct**

Given its superior knowledge and major role in creating and marketing the six CDOs,

RBS should have told Woori in 2006-07 the facts that it knew internally about those CDOs,

including the assets underlying them. It failed to do so in numerous respects.

**RBS's internal undisclosed knowledge that the CDOs it was marketing were**

**doomed to fail.** By the latter part of 2006, RBS knew that the market for CDOs was

deteriorating. According to report on the failure of RBS issued in December of 2011 by the U.K.

Financial Services Authority ("FSA") (available at http://www.fsa.gov.uk/pubs/other/rbs.pdf)

("FSA Report"):

> Concerns over the US sub-prime mortgage market were noted by GBM in the
> fourth quarter of 2006 when spreads were widening in mortgage-based securities.
> Also, super senior CDOs tranches were less attractive to investors because of their
> comparatively low yield compared with the riskier junior tranches. In addition, the
> growing market for CDOs meant that there was a greater demand for the underlying
> ABSs and so the cost of purchasing the ABSs [asset Backed Securities] to build
> CDOs rose. Around the same time, low interest rates led to reduced interest cash
> flows from mortgages. This meant that the returns on CDOs fell. By end 2006, RBS
> Greenwich Capital had five uncompleted CDOs deals where an open super senior
> exposure was retained, with a combined value of $3.35bn.

Compl., ¶55. The FSA Report went on to describe the choice made by GBM in January of 2007:

> At the 23 January 2007 Group Risk Committee it was noted that '*a number of sub-prime mortgage lenders had withdrawn from the market, and that there had been a slight increase in foreclosure activity centring (sic) around Michigan.*' Faced with a deteriorating market in January 2007 and a lack of investor demand for the super senior tranches, GBM believed it had two options. The first was that it could cancel the uncompleted CDO deals and sell the ABSs in the warehouse, potentially incurring major losses on those assets. The second was that it could complete the CDOs, sell the riskier, lower-rated junior tranches and seek to sell the lower-risk, highly rated super senior tranches later when, as it believed at the time, the market would improve. GBM considered that RBS would suffer greater damage if it tried to sell out the warehouses at that time.

*Id.* (emphases in original.) *See also id.*, ¶54. These CDOs included two in which Woori invested: Novastar in February of 2008 and ACA in March of 2008. *Id.*, ¶¶12-13.

**RBS's "waiving in" of loans rejected by its own due diligence consultant.** RBS used Clayton Holdings ("Clayton") to verify whether samples of mortgage pools that RBS was purchasing complied with applicable underwriting standards. *Id.*, ¶62. Clayton provided "Exception Reports" to RBS regarding the loans it reviewed.[2] On average in the four quarters of 2006 and the first two quarters of 2007, Clayton's "reject rate" for the loans that RBS brought to it for evaluation ranged between 14% and 24%, with an average of 17%. RBS thereupon got those nonconforming loans "waived" in. The final waiver rate in those six quarters was 38% and 64%, with an average of 53%. *Id.*, ¶62. Often, it would simply use Clayton's negative findings to negotiate a discount from the loan originator that ensured it more profit. *Id.*, ¶64.

As the Chairman of the FCIC noted in one of its hearings, this information was never disclosed to investors, a statement concurred in by Clayton's CEO. *Id.*, ¶66. It was certainly non-public information never disclosed to Woori. *Id.*, ¶105. The report issued by the Financial

---

[2] RBS asserts that the relevant Clayton report cited in the Complaint was issued after the events of 2006-07. Defs' Mem., pp. 23, 31. That may be true, but the information contained in it was based on monthly "Exception Reports" issued to Clayton's clients during the relevant time period. Letter from Paul T. Bossidy, Chief Executive Officer of, Clayton, to Phil Angelides, Chairman of the FCIC at 3 (Sept. 30, 2010), available at http://graphics8.nytimes.com/packages/pdf/opinion/Clayton-FCIC.pdf ("Clayton rolled out this system and its Exception Reports to our clients beginning in late 2005 and continuing throughout 2006.") The Court can take judicial notice of this document. *Samuels v. Air Transport Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993).

Crisis Inquiry Commission in January of 2011 concluded at pp. 169-70 (quoted in Complaint,

¶69):

> disclosures were insufficient for investors to know what criteria the mortgages they
> were buying actually did meet. Only a small portion—as little as 2% to 3%—of the
> loans in any deal were sampled, and evidence from Clayton shows that a significant
> number did not meet stated guidelines or have compensating factors. On the loans
> in the remainder of the mortgage pool that were not sampled (as much as 97%),
> Clayton and the securitizers had no information, but one could reasonably expect
> them to have many of the same deficiencies, and at the same rate, as the sampled
> loans. Prospectuses for the ultimate investors in the mortgage-backed securities did
> not contain this information, or information on how few loans were reviewed,
> raising the question of whether the disclosures were materially misleading, in
> violation of the securities laws.

**RBS's falsehoods to, and pressure tactics on, ratings agencies.** A credit rating is the

lifeblood of a CDO. As the Second Circuit has stated:

> [Issuers] have their securities rated for two reasons. First, once the security or debt
> has received a favorable rating, that rating makes it easier to sell the security to
> investors, who rely upon [the rating agency's] analysis and evaluation. The second
> reason is that a favorable rating carries with it a regulatory benefit as well. Fitch,
> along with its direct competitors Amici Moody's Investors Service, Inc.
> ("Moody's") and Standard & Poor's ("S & P"), has been designated by the
> Securities and Exchange Commission ("SEC") as a "nationally recognized
> statistical rating organization" ("NRSRO") whose endorsement of a given security
> has regulatory significance, as many regulated institutional investors are limited in
> what types of securities they may invest based on the securities' NRSRO rating.

*In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003).[3] According to the SEC, the "single most

important criterion" governing the conferral of NRSRO status is that "the rating organization is

recognized in the United States as an issuer of credible and reliable ratings by the predominant

users of securities ratings" and that part of conferring the NRSRO designation on such an entity

---

[3] *See also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 165
(S.D.N.Y. 2009) ("*Abu Dhabi*"); *King County, Wa. v. IKB Deutsche Industriebank, AG*, No. 09 Civ. 8387
(SAS), 2012 WL 1592193 at *2 (S.D.N.Y. May 4, 2012), *recon. denied*, 2012 WL 2160285 (S.D.N.Y. June
7, 2012) ("*KC II*") (both discussing importance of credit ratings in the context of structured investment
vehicles, which can include CDOs); U.S. Office of the Comptroller of the Currency at 11, available at
http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf ("[r]atings are
important because investors generally accept ratings by the major public rating agencies in lieu of
conducting a due diligence investigation of the underlying assets and the servicer.").

is "the rating organization's independence from the companies it rates."[4] As the Complaint

indicates, the ratings given to the CDOs at issue by the ratings agencies were very important to

Woori. Compl. ¶¶34, 39, 41-42, 112 (p. 45), 116, 126, 136, 145, 154.

Unbeknowst to Plaintiff, those ratings were based on a systematic pattern of lying to and

pressuring of the ratings agencies by RBS. To begin with, none of Clayton's reports were ever

disclosed to the ratings agencies. *Id.*, ¶¶70-71. Indeed, in a confidential "Managing Director's

Town Hall Meeting" conducted by Moody in 2007, the participants looked over their

relationship with their clients (which included RBS) and mentioned repeatedly that they were

being lied to and that such lying violated federal securities laws. *Id.*, ¶¶74-79. According to

Brian Clarkson ("Clarkson"), former CEO of Moody's, one such lie consisted of statements to

rating agencies that "no loans were originated in violation of any state or federal law." *Id.*, ¶78.

Clarkson added that "[t]here's a lot of fraud that's involved there, things we didn't see." *Id.*,

¶79. In September of 2007, Moody's decided to downgrade all ratings for RMBS issuances in

2006; as one of its Vice-Presidents noted, this posed a dilemma: new CDO ratings could not be

based on discredited RMBS ratings because that is like a "definition of securities fraud." *Id.*,

¶83.

The ratings agencies had better modeling tools that would have produced more truthful

ratings for RMBS and CDOs based on them prior to 2007, but failed to implement them. *Id.*,

¶85. This was due in part to pressure from banks. *See* report by Senate Permanent

Subcommittee on Investigations of the Senate Committee on Homeland Security and

Governmental Affairs, 112th Cong., entitled *Wall Street and the Financial Crisis: Anatomy of a

Financial Collapse* at 279-82 (Apr. 13, 2011). Compl., ¶86. Plaintiff had no access to this non-

---

[4] SEC, "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets" at 5–8 (Jan. 2003) (*available at* http:// www.sec.gov/news/studies/creditratingreport0103.pdf). *See KC II*, 2012 WL 1592193 at *2. For similar statements by the Office of the Comptroller of the Currency, *see* Compl., ¶¶35-36.

public information at the time it invested in the six CDOs at issue. *Id.*, ¶87.

**RBS's failure to disclose LIBOR manipulation**. With respect to the CDO interests

that Woori bought, RBS paid LIBOR plus additional basis points. *Id.*, ¶88. Barclays Bank has

already been fined $450 million as part of a multinational investigation of manipulation of

LIBOR rates by a cartel of banks. *Id.*, ¶94. Royal Bank has acknowledged that it will also be

fined for its participation, a fact confirmed by Stephen Hester ("Hester"), its CEO. *Id.*, ¶97.

Tan Chi Min, an employee/agent of RBS and Royal Bank in Singapore, has admitted his role

in the manipulation and implicated many other RBS affiliated employees. C.B. Lee ("Lee"),

an RBS and Royal Bank employee/agent in Singapore was the key contact with Woori with

respect to the CDOs in question, is under investigation for his role in the wrongful scheme,

but never disclosed the manipulation of the LIBOR rates tied to them. *Id.*, ¶¶98, 101

### C.    The OCs For the CDOs At Issue

RBS appears to believe that all of this undisclosed conduct is of no importance because

Woori is bound by OCs, in which it agreed it was a "sophisticated investor" and which contained

numerous risk disclaimers. Defs' Mem., pp. 27-28.

There is a disputed issue as to whether Woori was a "sophisticated investor" as to CDOs,

or that it "agreed" to this unilateral language contained in the OCs. It denies that it was, or did.

Compl., ¶43. As former Moody's Managing Director Jerome Fons has acknowledged, "subprime

RMBS and their offshoots offer little transparency around the composition and characteristics of

the loan collateral. ... Loan-by-loan data, the highest level of detail, is generally not available to

investors." Methods of credit analysis, he added, "are quite technical, often relying on advanced

statistical techniques" and therefore "beyond the grasp of many investors." FCIC Preliminary

Staff Report, "Credit Ratings and the Financial Crisis," pp. 8-9 (June 2, 2010) (available at

http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/2010-0602-Credit-Ratings.pdf ). *See*
Compl., ¶40.

Moreover, the statements in the OCs are not exculpatory of RBS's conduct. For example,
RBS says the OCs indicate that Woori should have conducted its own due diligence investigation
of those risks. But such an investigation between August 3, 2006 and March 8, 2007 would not
have revealed RBS's failure to follow its own underwriting guidelines, its internal knowledge of
rising defaults on its own loan portfolios for inclusion in RMBS, its internal decision to continue
marketing in January of 2007 five CDOs doomed to fail, its knowledge of pervasive deficiencies
in the loans available for securitization into RMBS and CDOs, its waiving in of loans rejected by
its own due diligence advisor, its repeated lying to and pressuring of ratings agencies, its
clandestine cartel activity involving LIBOR.

Many of the OCs contained the following language:

> The Co-Issuers have taken all reasonable care to confirm that the information
> contained in this Offering Circular is true and accurate in all material respects and is
> not misleading in any material respect and that there are no other facts relating to
> the Co-Issuers or the Notes, the omission of which makes this Offering Circular as a
> whole or any such information contained herein, in light of the circumstances under
> which it was made, misleading in any material respect. The Co-Issuers accept
> responsibility for the information contained in this document accordingly. To the
> best knowledge and belief of the Co-Issuers the information contained in this
> document is in accordance with the facts and does not omit anything likely to affect
> the import of such information.

*Id.* ¶¶113 (p. 48), 123, 133. *See id.*, ¶108 (p. 45) (similar language). These statements by co-
issuers that were dummy entities functioning as the alter egos of RBS are attributable to RBS.[5]
*Id.* ¶¶109 (p. 45), 114 (p. 48), 124, 134.

Most of the OCs referred to the "A" (or "A2") or "A-" (or "A3") ratings for the
mezzanine tranches in which Woori invested, thus representing that they were "investment

---

[5] Plaintiff has pled that these issuers functioned as mail drops with no employees, nominal capitalization, and no
operating history; by contract with RBS, they assumed no inventory risk for the CDOs they issued. *Id.* ¶¶19-23.
This is enough to plead alter ego status or principal/agent status.

grade" securities. *Id.* ¶¶ 105-06 (p. 45), 110, 112 (p.45), 116-17, 136-37, 145-46.

The OCs also had break-even default scenarios based on historical data from 1982-2003 that did not take into account the defective RMBS used to collateralize CDOs from 2005 on. *Id.* ¶¶111, 115, 128-29, 135, 146.

Some of The OCs asserted that "care", "good faith", "skill" or an "arms' length basis" were used to select the collateral underlying the CDO. *Id.* ¶¶107-09 (pp. 46-47), 120.  Other indicia of safety, including purported asset overcollateralization, were built into (and disclosed) as foundational to some of these deals by RBS. *Id.* ¶¶118, 130, 136, 147.  In truth, the CDOs were not overcollateralized because the toxic mortgages that served as their collateral were not worth anywhere near what Defendants claimed.

And for the Novastar CDO, Lee, an RBS employee, made false assurances of safety to Woori employees. *Id.* ¶139.

## III.   ARGUMENT

### A.   Standards Governing This Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*")). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 556. Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. If a complaint raises a "reasonable expectation" that discovery will reveal evidence of the challenged conduct, that is sufficient. *Twombly*, 550 U.S. at 556. A court should not dismiss a complaint for failure to state a claim if the factual

allegations sufficiently "raise a right to relief above the speculative level." *Id..* at 555.

In ruling on a motion to dismiss, the Second Circuit has recently explained:

> The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. "[F]act-specific question[s] cannot be resolved on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir.2001) .... A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.
>
> * * *
>
> Given that the plausibility requirement "does not impose a probability requirement at the pleading stage," the *Twombly* Court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.". (internal quotation marks omitted) (emphases added).

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("*Anderson*").

With respect to Woori's fraud claim, a heightened pleading standard is applicable under Fed. R. Civ. P. 9(b). A fraud claim alleging material misstatements or omissions must "(1) detail concerning the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

## B.   Plaintiff Has Adequately Pled Venue

**Venue is proper in this district pursuant to 28 U.S.C. §1392(b)(1).** RBS contends that Plaintiff's venue allegations under 28 U.S.C. §1392(b)(1) are insufficient because there is no showing that venue is proper as to *each* defendant. This argument fails. Venue is proper in this district if one of the defendants resides in this district and all of them are subject to the personal jurisdiction of the Court. *See* 28 U.S.C. §§1392(b)(1) and (b)(3).

RBS takes issue with the fact that there is no basis for the court to exercise jurisdiction over RBSH. However, pursuant to New York's long-arm statute, "[a]s to a cause of action

arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person *or through an agent:* ... 2. commits a tortious act within the state." N.Y. C.P.L.R. §§302(a) and (a)(2) (emphases added).

As an initial matter, it is undisputed that RBSH "direct[s] the management [and] policies" of RBSS. *See* Declaration of Christopher L. Lebsock ("Lebsock Decl."), Exh. 4). It is well-established that an agent for purposes of §302(a)(2) includes a co-conspirator that is physically present in New York. *Chrysler Capital Corp. v. Century Power Corp.,* 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) ("[t]he New York activities of a co-conspirator may also be imputed to an out-of-state defendant for purposes of personal jurisdiction under §302(a)(2) under an agency rationale."). Here, Plaintiff pleads that RBSH's former name was RBS Greenwich Capital Holdings, Inc. and that it was the parent and affiliate of RBSS. *See* Compl. ¶15. RBS admits, and Plaintiff pleads, that RBSS and its affiliates have been implicated in the regulatory investigations that give rise to the complaint—specifically investigations into RBS' conduct concerning manipulation of CDO ratings and a conspiracy involving the manipulation of LIBOR. *See id.* ¶28. Plaintiff further pleads that the "RBS Greenwich" logo was prominently displayed on the offering materials supplied to Plaintiff. *Id.* ¶17. Taken together, these allegations satisfy Plaintiff's "modest burden" of establishing personal jurisdiction over RBSH by virtue of its agency relationship with RBSS. *Emerald Asset Advisors, LLC v. Schaffer*, No. 11 CV 1871 (ADS)(WDW), 2012 WL 3870318 at *10 (E.D.N.Y. Sept. 6, 2012). And, RBS cannot deny that other co-conspirators engaged in tortious acts at issue in the complaint while physically present in New York, including Citigroup, which is also under investigation for its LIBOR related misconduct. *See* Compl. ¶96.

13

This Court also has personal jurisdiction over the Issuer Defendants. Where "personal jurisdiction exists over [one defendant], jurisdiction over his alter ego is proper as well." *China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc.*, No. 06 CV 13107 (LAK), 2012 WL 3101274 at *8 (S.D.N.Y. Jul. 31, 2012). Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a "less onerous standard" than that necessary for equity to pierce the corporate veil for liability purposes under New York law. At this stage of the proceedings, assessing whether inequitable conduct has occurred is not proper. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (reversing trial court on this basis). Here, the Issuer Defendants are nothing more than shells, with no assets, no employees, no operating history, and no inventory risk. *See* Compl. ¶16-23. Furthermore, at least one of the Issuer Defendants, Webster CDO (Delaware) Corp. "irrevocably submit[ted]" to jurisdiction in New York and, specifically to the courts in this federal district. *Id.*, ¶27; Webster OC (Lebsock Decl., Exh. 7, p. 23). Accordingly, the Court has personal jurisdiction over these defendants and the venue provision of 28 U.S.C. §1392(b)(1) is therefore satisfied.[6]

**Venue is proper in this district pursuant to 28 U.S.C. §1392(b)(2).** RBS also contends that Plaintiff has failed to sufficiently plead that "a substantial part of the events or omissions giving rise to the claim occurred" in this district. *See* 28 U.S.C. §1392(b)(2). This is incorrect. Plaintiff pleads at length about the ways in which RBS manipulated and pressured the ratings agencies—all of whom are indisputably headquartered in this District—including through

---

[6] In the event that venue turns on any perceived short-comings concerning personal jurisdiction, leave to amend should be granted, or alternatively, dismissals of the offending defendants can be made. *PI, Inc. v. Quality Products, Inc.*, 907 F. Supp. 752, 760 (S.D.N.Y. 1995). *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir.1963) (holding that when a case involves motions to dismiss for lack of jurisdiction, improper venue, and failure to state a claim, the court must consider jurisdiction and venue first, in that order); *German v. Federal Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y.1995), citing *E.I. Du Pont De Nemours & Co. v. Fine Arts Reproduction Co.*, No. 93 Civ. 2462 (KMW), 1995 WL 312505, at *1–2 (S.D.N.Y. May 22, 1995) (Fed. R. Civ. P. 21 "permits a court to add or drop parties to an action when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation.").

deceitful conduct, withholding of important information, and improper coercion. *See* Compl.
¶¶66-81, 83-86.  These allegedly false ratings were foundational to the deals. *See* Lebsock Decl.,
Exhs. 2, 5, 7 (cover pages) ("[i]t is a condition to the issuance of the Notes that the . . . Notes be
rated . . . by Fitch and . . . by Standard & Poor's").  And, to underscore the importance of these
ratings to RBS and its counter-parties, including Plaintiff, RBS admits that its communications
with the ratings agencies are subject to investigation "by federal and state governmental law
enforcement and other agencies and self-regulatory organizations." Compl. ¶28.

  Plaintiff also pleads details about the substantial wrongful conduct that RBS engaged in
concerning the manipulation of LIBOR. *See id.* ("RBSS[] and its affiliates continue to receive
requests from various regulators, including the Commodity Futures Trading Commission, United
States Department of Justice, and other regulators, seeking documents and communications
related to the process and procedures for setting LIBOR and other interest rates, together with
related trading information.").  The improper conduct involved Citigroup, who is also
indisputably headquartered in this District (*id.* ¶96) and Barclays employees based in New York,
among others.  Moreover, the Federal Reserve Bank of New York has recently released *some*
information about LIBOR manipulation as a result of its market monitoring activity in this
District. *See*
http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html.

  As this Court has stated, "[t]o be sure, venue can be proper in more than one district; that
is, venue is not restricted to the district with the 'most substantial' connection to the events or
omissions related to a claim." *Prospect Capital Corp. v. Bender*, No. 09 Civ. 826 (HB), 2009
WL 4907121 at *3 (S.D.N.Y. Dec. 21, 2009). However, RBS's suggestion that the facts of
*Prospect* demonstrate that venue is improper in this case must fail. In that case, the contacts with

New York occurred after the conduct giving rise to liability took place or were only incidental to it. *See id.* at \*3-5. Here, the contacts with this district are the contacts that give rise to RBS' liability to Plaintiff in the first instance.  Venue is proper is 28 U.S.C. §1392(b)(2).

**The motion to transfer should be denied.** "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought...." 28 U.S.C. §1404(a). The burden is on the moving party to make a "clear and convincing showing that transfer will serve the interests of convenience and fairness." *Capitol Records, LLC v. VideoEgg, Inc.,* 611 F. Supp. 2d 349, 368 (S.D.N.Y.2009) (Baer, J.). *See also N.Y. Marine & Gen., Ins. Co. v. Lafarge N. Am., Inc.,* 599 F.3d 102, 114 (2d Cir. 2010) (the party requesting transfer carries the "burden of making out a strong case for transfer.").

"Deciding a §1404(a) motion to transfer venue 'requires a two-part inquiry: first, whether the action to be transferred might have been brought in the transferee court; and second, whether considering the convenience of the parties and witnesses, and the interest of justice, a transfer is appropriate.'" *AGCS Marine Ins. Co. v. Associated Gas & Oil Co., Ltd.,* 775 F. Supp. 2d 640, 645 (S.D.N.Y. 2011).

With respect to the first prong of the test, "subject matter jurisdiction, personal jurisdiction and venue all must have been proper in the proposed transferee court at the time the action was filed." *Id.* at 646. RBS has failed to make any showing at all that this prong of the test can be met with respect to the Issuer Defendants.

With respect to the second prong, the court must "evaluate whether transfer is warranted using several factors relating to the convenience of transfer and the interests of justice." *In re*

16

*Collins & Aikman Corp. Sec. Litig.,* 438 F. Supp. 2d 392, 394 (S.D.N.Y. 2006). These factors include:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Id.*

Here, transfer of venue to Connecticut is not warranted because witnesses can be deposed where they reside and many will be located in Korea, Singapore and other locations far distant from Connecticut. Third-parties, including the ratings agencies and co-conspirators, like Citigroup, involved in manipulating LIBOR are headquartered in New York, not Connecticut. The convenience of RBS's party-affiliated witnesses is not an important factor in the §1404(a) equation. *Getz v. Boeing Co.*, 547 F. Supp. 2d 1080, 1084 (N.D. Cal. 2008)("The Court, however, discounts any inconvenience to the parties' employees, whom the parties can compel to testify."). Moreover, the parties generally appear in court through their attorneys, and RBS has selected attorneys that are located in New York, conveniently located near the courthouse. Plaintiff's attorneys are located in San Francisco and Washington D.C. and venue in Connecticut presents additional travel hurdles for them. And, the location of documents has been determined not to be a substantial consideration in this modern era of electronic discovery. *Morris v. Ernst & Young, LLP*, No. 12 CV 0838 (KMW), 2012 WL 3964744 at *4 (S.D.N.Y. Sept. 11, 2012). Additionally, transfer of this case is inappropriate because judges sitting in New York are more familiar with New York law than out-of-state judges, and here, the OCs state that New York law applies. Compl. ¶27. *See People of the State of N.Y. ex rel. Spitzer v. Operation Rescue Nat'l,* 69

F. Supp. 2d 408, 418 (W.D.N.Y. 1999) (familiarity with substantive law "strongly favors" retention of the action).

At bottom, a plaintiff's choice of forum is entitled to substantial weight and should not be disturbed unless the balance of the factors weighs strongly in favor of transfer. *See Berman v. Informix Corp.,* 30 F. Supp. 2d 653, 656 (S.D.N.Y.1998); *Iragorri v. United Tech. Corp..,* 274 F.3d 65, 72 (2d Cir.2001) (courts must give deference to a plaintiff's choice of a *non-home forum* where that choice was "motivated by legitimate reasons, including plaintiff's convenience and the ability of [plaintiff] to obtain jurisdiction over the defendant."). In this case, there is no doubt that Plaintiff has "legitimate reasons" to litigate this case in New York. All of the Offering Circulars—which were created and disseminated by RBS—contemplate that New York law will apply to the CDO transactions at issue. Compl. ¶¶107, 112, 122, 132, 141, 151. The Webster CDO Offering Circular additionally contains a forum selection clause designating this district as the venue for litigating disputes. *Id.* ¶27; Lebsock Decl., Exh. 7, p. 23; *see also Mpower Commc'ns. Corp. v. Voipld.com, Inc.,* 304 F. Supp. 2d 473, 475 (W.D.N.Y. 2004) (quoting *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988)) ("[T]he presence of a forum selection clause will ... typically be 'a significant factor that figures centrally in the district court's calculus' in the decision on whether to transfer venue."). Under these circumstances, New York is a reasonable and appropriate venue for this litigation and RBS has failed to make a "clear and convincing" showing that Plaintiff's chosen forum should be disregarded.[7]

---

[7] Moreover, RBS's moving papers contemplate a transfer of the case to Connecticut, and once there, RBS apparently intends to have some or all of the claim transferred back to this district for consolidation with *Mayor & City Council of Baltimore v. Credit Suisse Group AG (LIBOR Litig.),* No. 1:11-cv-5450 (NRB) (S.D.N.Y.) ("*Libor Litigation*"). This type of gamesmanship does not satisfy the clear and convincing standard that would justify a venue transfer in the first instance. In the alternative, RBS seems to ask this Court to sever portions of Plaintiff's claims—not entire claims, but purportedly distinct factual components of them—and transfer them to Judge Buchwald for inclusion in the *Libor Litigation* for pre-trial coordination. "Federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Laureano v. Goord,* No. 06cv7845,

**C.**     **Plaintiff Has Adequately Pled Fraud**

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a

misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3)

which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff

reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. A.C. Rochester*, 273

F.3d 153, 156 (2d Cir. 2001). Plaintiff has adequately pled each of these elements.

**1.**     **Plaintiff Has Adequately Pled Omissions Or Misrepresentations**

**Makers of alleged misrepresentations or omissions.** Defendants first argue that Woori

has failed to identify who made the alleged misrepresentations or omissions. Defs' Mem., pp. 14-

15. However, where defendants are insiders or affiliates participating in the offer of securities,

reference to an offering memorandum satisfies Rule 9(b)'s requirement of identifying time,

place, speaker, and content of representation. *Abu Dhabi*, 651 F. Supp. 2d at 171 (citing cases).

Further, RBS's name and logo appear on the disclosures, and it was uniquely positioned to know

that information in the OCs and pitch books was misleading, but failed to follow through with

specific, and material information that made the general risk disclosures false and misleading.

*See Coty of Roseville Employees' Ret. Sys. v. Energy Solutions, Inc.*, 814 F. Supp. 2d 395, 417

(S.D.N.Y. 2011) (finding that, in addition to the company itself, all a document's signatories "are

proper defendants on the claims regarding alleged misstatements in that document."). Further,

the issuers are the alter ego of RBS and their conduct is chargeable to it. *See, e.g.* Compl., ¶¶ 21,

60. *See Avila v. Lease Finance Group, LLC*, No. 09 CV 8633, 2012 WL 3165408, *7 (S.D.N.Y.

---

2007 WL 2826649, at *8 (S.D.N.Y. Aug. 31, 2007) (quoting *Marisol A. v. Guiliani*, 929 F.Supp. 662, 693
(S.D.N.Y.1996)). Transferring certain factual components of this garden variety fraud and negligent
misrepresentation case into a sprawling multi-district *antitrust* litigation—is wholly inappropriate. The claims
do not overlap, nor do the remedies. That litigation will take years to resolve and involves classes of thousands
and procedural matters, including class certification, that have no bearing on the resolution of this case. The
parties and this court are well-equipped to deal with any overlapping issues that *might* arise without the need to
sever and transfer limited factual issues to Judge Buchwald.

Jul. 31, 2012) ("*Avila*") ("under the theory that UCI and MSI are alter egos, MSI may be held liable for the acts of UCI— *i.e.*, the acts of UCI may be imputed to MSI)."[8]

This view is consistent with the doctrine of "group pleading", which has been applied to common law fraud claims. *Id.*, at 176-77; *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 652 (S.D.N.Y. 2012) ("*Dodona*"). Citing numerous cases from the Second Circuit and this district, Judge Scheindlin in *Abu Dhabi* explained the doctrine as follows:

> [T]he group pleading doctrine provides an exception "'to the requirement that the fraudulent acts of each defendant be identified separately in the complaint.'" "[N]o specific connection between fraudulent representations in [an] [o]ffering [m]emorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question." The group pleading doctrine applies where group-published information, such as an offering memorandum, "are the collective work of those individuals with direct involvement in the everyday business of the company."

651 F. Supp. 2d at 176-77 (footnotes omitted).[9]

Here, as noted above, Plaintiff has alleged that the issuers of the six CDOs in question were essentially dummy corporations set up by RBS with no capital, employees or history of operations. RBS picked the mortgage loans securitized into RMBS that it created. RBS used

---

[8] Actual fraud need not be demonstrated for alter ego liability to attach, but it may nevertheless be relevant evidence. *Rotella v. Derner*, 283 A.D.2d 1026, 1026 , 723 N.Y.S.2d 801, 802 (4th Dep't 2001). A showing that the control over the corporation was used as a means to perpetuate a wrongful or unjust act upon the plaintiff will suffice. *Id.*; *Lederer v. King*, 214 A.D. 2d 354, 354, 625 N.Y.S.2d 149, 150 (1st Dep't1995).

[9] *Accord King County, Wa. v. IKB Deutsche Industriebank AG*, 751 F. Supp. 2d 652, 658 (S.D.N.Y. 2010) ("*KC I*") (in case involving alleged fraud in the offering and sale of structured finance securities; court said that"[t]he [complaint's] allegations as to Morgan Stanley's involvement in the fraud are sufficient to render it an 'insider' for purposes of the group pleading doctrine."). *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 405-06 (S.D.N.Y. 2010) ("*Anwar*") (in case where an allegedly fraudulent "operation encompassed multiple interrelated entities ..." and plaintiff alleged "a tight weave of connections between" them, the court held that "[a]t this stage of the litigation, any misstatements that could reasonably be found to have issued from one, essentially issued from all"); *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (group pleading doctrine allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of individuals with direct involvement in the everyday business of the company") (internal quotation marks omitted). In a very recent decision, Judge Rakoff noted that the "group pleading" principle has been widely followed by courts in this district and remains sound law. *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, No. 11 Civ. 5026 JSR, 2012 WL 2866425 at *14 (S.D.N.Y. July 13, 2012).

those RMBS as collateral for CDOs that it created and underwrote. RBS marketed those CDOs to unsuspecting victims like Woori. For RBS now to say "the dummy entities I created to lure you into this deal made the representations that all the material facts were in the OCs and nothing important was left out, not me" should not be tolerated.

RBS relies on the decision of *Employees' Ret. Sys. of the Gov't of V.I. v. Morgan Stanley & Co., Inc.*, 814 F. Supp. 2d 344 (S.D.N.Y. 2011) ("*VI*") for a contrary conclusion. Defs' Mem., pp. 15-16. But that decision (which, as of this writing, has not been cited by any other court) is inapposite. The district court in *VI* did not consider the effect of the "group pleading" doctrine, or the cases concerning alter ego. Its ruling is inconsistent with other recent decisions involving fraud claims concerning CDOs, such as *Dodona, Dandong* and *Richman v. Goldman Sachs Group, Inc.,* No. 10 Civ. 3461 (PAC), 2012 WL 2362539 (S.D.N.Y. June 21, 2012) ("*Richman*"). And the court in *VI* was not confronted with a complaint like this one that alleged the existence of "multiple interrelated entities" with a "tight weave of connections among them" so that "any misstatements that could reasonably be found to have issued from one, essentially issued from all." *Dodona,* 847 F. Supp. 2d at 647 n.13 (quoting *Anwar*, 728 F. Supp. 2d at 405).[10] Moreover, as the court in *VI* noted, Morgan Stanley did not make direct marketing pitches to the plaintiff in that case. 814 F. Supp. 2d at 354. Here, RBS directly marketed the CDOs in question to Woori.

---

[10] In addition, as the OCs themselves reflect, an RBS entity (typically RBSS) was an "underwriter" for each of the six CDOs at issue here and was also the "underwriter" for some of the RMBS used as collateral supporting them. ACA OC, p. 57, 73, 167; Cairn OC, p. 68; Novastar OC p. 68, 146; TABS OC, p. 69; Webster OC, p. 35. The relevant excerpts are attached as Exhs. 1, 3, 5-7 to the Lebsock Decl. The Second Circuit said in *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 370 (2d Cir. 1973) ("*Chris-Craft*"), "[n]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter." Courts have recognized that "the underwriter's role in a public offering is such that *the representations in a registration statement or prospectus are its own*...." *In re MTC Electronic Technologies Shareholder Litig.,* 993 F. Supp. 160, 162 (E.D.N.Y. 1997) (citing *Chris-Craft*, 480 F.2d at 370) (emphasis added). *See Phillips v. Kidder, Peabody & Co.,* 750 F. Supp. 603, 609-10 (S.D.N.Y. 1990) (court denied a motion to dismiss a Rule 10b-5 claim because the complaint "identified the defendant as the underwriter for the stock, and hence as a party responsible for the content of the Prospectus." Here, as the underwriter for the CDOs that it created and marketed, RBS ought not to be allowed to disclaim the statements by the co-issuers of those CDOs.

**Alter ego allegations.** Plaintiff has specifically pled that these issuers functioned as mail drops with no employees, nominal capitalization, and no operating history; by contract with RBS, they also assumed no inventory risk for the CDOs they issued. *Id.* ¶¶19-23. This is enough to plead alter ego status. *See, e.g., Accordia Northeast, Inc. v. Thesseus Int'l Asset Fund, N.V.*, 205 F. Supp. 2d 176, 182 (S.D.N.Y. 2002) (allegations, *inter alia*, that companies had no assets and no employees or directors other than the alleged alter ego, and who were represented solely by alleged alter ego who negotiated and executed the agreements at issue and promised the companies would pay premiums, were adequate to justify veil piercing); *Farley v. Davis*, No. 91 Civ. 5530 (PKL), 1992 WL 110753 (S.D.N.Y. May 8, 1992) (complaint alleged company had no cash and functioned as "alter ego"). Notably, even defendant Novastar ABS CDO I, Inc. argues that it is not a company of any real substance. *See* "Novastar Defendants' Memorandum Of Law In Support Of Motion To Dismiss Complaint", p. 15 (Sept. 12, 2012)(Dkt. No. 64)("Woori could not—and does not—claim to have believed that NovaStar had unique or special expertise in light of its recent formation and fully-disclosed lack of any employees, operating history or CDO experience whatsoever.").

Nonetheless, RBS contends that a Rule 9(b) standard should apply to such allegations, and that Plaintiff has failed to satisfy its pleading obligations. Defs' Mem., p. 17. In fact, the pleadings concerning the issuers' formation are specific and detailed, and RBS cannot, in good faith, deny they are true. Moreover, Rule 9(b) does not apply where a complaint alleges a non-fraudulent wrong to justify veil-piercing.[11] Woori need not contend that creation of separate CDO issuers was in and of itself fraudulent. Here, Plaintiff asserts that it is wrongful for RBS to

---

[11] *Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*, No. 01 Civ. 11765 (CSH), 2002 WL 31050846, at *5 (S.D.N.Y. Sept. 12, 2002). *Accord Rolls–Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 121–22 (S.D.N.Y. 1996); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, No. 01 Civ. 2491 (GEL), 2002 WL 389155, at *19 (S.D.N.Y. March 11, 2002).

hide behind those paper entities to try to avoid responsibility for conduct and statements

attributed to them in OCs.  The pleadings are sufficient for this purpose.

**Duty to disclose omitted material information.** Many of the allegations here turn on

outright omissions or allegations that materially incomplete information was given. These claims

are sufficient to withstand a dismissal motion. Defendants spend multiple pages discussing

various omissions in the Complaint (Defs Mem., pp. 17-26), and how they are supposedly dealt

with by disclaimers or limitations in the relevant OCs, but fail to come to grips with the body of

law recognizing the actionability of omissions and misleading partial statements. As the Second

Circuit has said, when a corporation chooses to speak—even where it lacks a duty to speak it—

has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d

Cir. 2002) ("*Caiola*"). This analysis was applied by Judge Marrero in *Dodona*:

> Since the Offering Circulars contained affirmative representations regarding the
> risks of investing, the Marketing Defendants had a duty to ensure that those
> statements were accurate and complete. *See Panther Partners, Inc. v. Ikanos
> Commc'ns, Inc.*, 538 F.Supp.2d 662, 669 (S.D.N.Y.2008) ("[R]isk disclosures must
> accurately characterize the scope and specificity of the risk, as understood at the
> time the statements are made [.]"); *see also In re Am. Int'l Grp., Inc. 2008 Sec.
> Litig.*, 741 F.Supp.2d 511, 531 (S.D.N.Y.2010) ("[G]eneric risk disclosures are
> inadequate to shield defendants from liability for failing to disclose known specific
> risks.").
>
> Dodona has adequately alleged an actionable omission because, assuming it is right
> about the known risks, the risk disclosures in the Offering Circulars were inaccurate
> and therefore misleading. The Goldman-authored emails and documents cited in the
> Complaint—discussed above in the context of *scienter*—indicate that the
> Defendants were aware of a buildup of negative events in the subprime mortgage
> market, and knew the outlook for subprime-mortgage related assets was gloomy.
> Indeed, the Complaint indicates that Goldman had determined in late 2006 that the
> risks associated with subprime-related assets were substantial enough to warrant a
> major shift in strategy. Yet, in addressing the risks, the Offering Circulars provide
> only boilerplate statements regarding the "SPECULATIVE" and risky nature of
> investing in securities, the possibility of market downturns, and the risks generally
> associated with mortgage-backed assets.

847 F. Supp. 2d at 646-47. *Accord Dandong*, 2011 WL 5170293 at *13 ("[p]ut differently,

'[g]eneral risk disclosures in the face of specific known risks which border on certainties' are not

sufficient to defeat a securities fraud claim") (quoting *In re Prudential Sec. Ltd. Pshps. Litig.*,

930 F. Supp. 68, 72 (S.D.N.Y. 1996)); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,

Inc.*, No. 08 Civ. 7508 (SAS), 2012 WL 3584278 at *13 (S.D.N.Y. Aug. 17, 2012) ((in summary

judgment context, ratings that misstated the likelihood that a structured investment vehicle

("SIV") would collapse and implied that a detailed fact analysis had been conducted when one

had not stated actionable claim) (citing *New Jersey Carpenters Health Fund v. DLJ Mortg.

Capital, Inc.*, No. 08 Civ 5653 (PAC), 2010 WL 1473288 at *6 (S.D.N.Y. March 29, 2010))

(citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009)).

Likewise, here, the disclaimers in the six OCs at issue all talk about risks generically and

do not deal with the omissions alleged in the Complaint, such as RBS's systematic failure to

follow its own underwriting guidelines, its widespread waiving in of loans that its own risk

consultant had rejected, the significant defaults on its own loan portfolios, its decision to move

away from subprime risk, its knowledge of pervasive deficiencies in the loans available for

securitization, its pressuring of rating agencies to give favorable ratings, and its concealment of

its cartel activity related to LIBOR. *See Caiola*, 295 F.3d at 321.[12] There are numerous federal

cases in this district where various types of undisclosed risks analogous to those Plaintiff has

averred here have been deemed sufficient to withstand a motion to dismiss.[13]

---

[12] *Accord Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (holding that a plaintiff can overcome risk disclosure statements and cautionary language if "the language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss"); *Mfrs.' Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993) (expressing rule that a valid disclaimer provision "must contain explicit disclaimers of the particular representations that form the basis" of the fraud claim).

[13] *See, e.g., KC I*, 751 F. Supp. 2d at 657-58 (investors in an SIV alleged fraud adequately where they claimed that Morgan Stanley caused ratings agencies to issue false ratings for the SIV and distributed documents containing those ratings to investors); *Abu Dhabi*, 651 F. Supp. 2d at 175-77 (on a motion to dismiss a suit over investments in an SIV, court held allegations that that ratings by rating agencies could constitute actionable opinions if ratings agencies did not believe in those opinions and that Morgan Stanley, as the one who secured those opinions, was

Similarly, New York courts have stated that "a purchaser may not be precluded from claiming reliance on misrepresentations of fact peculiarly within the seller's knowledge, notwithstanding the execution of a specific disclaimer." *Steinhardt Group Inc. v Citicorp*, 272 A.D.2d 255, 257, 708 N.Y.S.2d 91 (1st Dep't 2000). *Accord, Tahini Investments, Ltd. v. Bobrowsky*, 99 A.D.2d 489, 490, 470 N.Y.S.2d 431, 433 (2d Dep't 1984). Like the Second Circuit, New York courts subscribe to the view that a disclaimer must be "specifically applicable to the alleged misrepresentation at issue" and that "general disclaimers contained in the private placement memorandum" are not sufficient. *Silver Oak Capital L.L.C. v UBS AG*, 82 A.D.3d 666, 667, 920 N.Y.S.2d 325, 326 (1st Dep't 2011). As one New York trial judge recently summed up the law, "where the facts allegedly misrepresented were within the exclusive knowledge of the defendant, or where one party's superior knowledge of essential facts renders the transaction without disclosure inherently unfair, a sophisticated plaintiff's reliance on the defendant's misrepresentations is not unreasonable as a matter of law." *Viking Global Equities, L.P. v. Porsche Automobil Holding SE*, No. 650435/11, 36 Misc.3d 1233(A), 2012 WL 3640864 at *6 (N.Y. Sup. Aug. 6, 2012) ("*Viking*").

Not surprisingly, then, many New York courts have upheld complaints alleging fraud on grounds similar to those presented by Plaintiff.[14]

---

responsible for them, stated a cause of action); *Richman*, 2012 WL 2362539 at *10-*11 (fraud claim by investor in CDOs sustained where there was no disclosure that defendant or a hedge fund with whom it was working secretly shorted CDOs); *Dodona*, 847 F. Supp. 2d at 647-49 (fraud claim by CDO investor sustained based on failure to disclose internal negative assessments of subprime risk disclose and secret shorting of assets used as collateral); *Dandong*, 2011 WL 5170293 at *12 (fraud claim by CDO investor upheld based on allegations that defendant secretly shorted collateral used in CDO). *See also In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493 (S.D.N.Y. 2010), *aff'd*, 650 F.3d 167 (2d Cir. 2011) (allegations that "loan originators systematically disregarded the stated underwriting guidelines, including the procedures for originating loans pursuant to the guideline exceptions, and ignored the borrowers' ability to repay in order to originate as many mortgage loans as possible" supported a reasonable inference that statements in offering memoranda were "materially misleading").

[14] *See, e.g., MBIA Ins. Co. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 294, 928 N.Y.S.2d 229, 233 (1st Dep't 2011) ("*MBIA I*") (forward guarantee insurance provider stated fraud claim against creators of RMBS because the latter disseminated "prospectuses [that] contained false representations about Countrywide's compliance with its

And as for allegations about failure to disclose LIBOR manipulation, RBS contends that

the particulars of the alleged conspiracy or that the employee from Singapore identified dealt

only with yen LIBOR, not dollar LIBOR. Defs' Mem., pp. 24-25. But as the Complaint notes,

Hester, Royal Bank's CEO, has *admitted* that his entire company is implicated in the LIBOR

scandal and that an investigation by the U.K.'s Financial Services Authority is in process.

Compl., ¶97; *see also* ¶28 (U.S. operations also under investigation). As he stated, "[t]he Libor

situation is on our agenda and is a stark reminder of the damage that individual wrongdoing and

inadequate systems and controls can have in terms of financial and reputational impact." *Id.*, ¶99.

Under the standards set forth by the Second Circuit in *Anderson*, this is a plausible claim.

**Misstatements in OCs.** Defendants also assert that there were no misstatements in the

relevant OCs. *Id.*, pp. 17-25. They assert that various statements of which Plaintiff complains

were mere "opinions" or "predictions" and accuse Plaintiff of making "hindsight-based

claim[s]". That is not the case; Plaintiff is alleging the making of statements that were known to

---

underwriting guidelines, the independence of the third-party appraisers, and Countrywide's knowledge of facts that would have caused a reasonable originator to conclude that a borrower would not be able to repay the loan"); *China Dev. Indus. Bank v. Morgan Stanley & Co.,* 86 A.D.3d 435, 436, 927 N.Y.S.2d 52 (1st Dep't 2011) ("*China Bank*") (sophisticated investor in credit default swap allowed to pursue claim against defendant because the latter had "peculiar knowledge of the application of grandfathered ratings, the unstable collateral which was sold, and its misstatements regarding the investment risks involved"); *M&T Bank Corp. v. Gemstone CDO VII, Ltd.,* 68 A.D.3d 1747, 1750, 891 N.Y.S.2d 578, 580 (4th Dep't 2009) (defendants who marketed a CDO failed to disclose that "they had decreased their level of screening and due diligence undertaken to ensure the security of the collateral underlying the notes and that they had withheld certain relevant information from the Rating Agencies"); *ACA Fin. Guar. Corp. v. Goldman Sachs & Co.,* No. 6500027/11, 2012 WL 1425264 (N.Y. Sup. Apr. 23, 2012) ("*ACA*") (fraud claim by sophisticated investor based on defendant's working with a hedge fund to secretly select collateral for a CDO that the hedge fund was shorting was allowed to proceed); *MBIA Ins. Co. v. Royal Bank of Canada,* 28 Misc.3d 1225(A), 2010 WL 3294302 at *33 (N.Y. Sup. Aug. 19, 2010) (in a case where sophisticated investor who had entered into credit default swap contracts involving CDOs with many disclaimers, court held that "[p]laintiffs' allegations concerning RBC's access to crucial loan information, which Plaintiffs may been able to discover but only though extraordinary effort or great difficulty, are sufficient to bring Plaintiffs' complaint within the peculiar knowledge exception to a disclaimer bar, at least for purposes of a motion to dismiss. Under this exception, a duty to disclose arises where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair"); *MBIA Ins. Co. v. Residential Funding Co., LLC,* 26 Misc.3d 1204(A), 2009 WL 5178337 at *4 (N.Y. Sup. Dec. 22, 2009) ("*MBIA II*") (financial guaranty insurance provider for five RMBS stated an actionable claim for fraudulent inducement; "the fraud cause of action survives here, because it is premised on allegations that RFC misrepresented various statistics and other existing facts about the underlying mortgage loans that RFC contributed to the mortgage loans pools").

be false when made. In *Dodona*, Judge Marrero rejected a similar argument, saying
"[d]efendants argue that Dodona is improperly claiming 'fraud by hindsight.' As Defendants
point out, it is impossible to know for certain how a market will perform. However, '[t]he
incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and
omissions that were misleading and false at the time they were made.'" 847 F. Supp. 2d at 644
(citations and footnote omitted)(quoting *In re Bear Stearns Cos., Sec., Derivative, & ERISA
Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y.2011)). With respect to the ratings by the rating
agencies, Woori has alleged facts that support the inference that they were false when made.
Representatives of Moody's, for example, deemed them to be the product of lies and fraudulent
tactics by their clients. Those sentiments, as quoted in the Complaint, applied equally to the
ratings provided to RMBS and CDOs. Likewise, RBS supplied no Clayton Reports to any rating
agency, thereby tainting all ratings affected by that omission. The FCIC Report, as quoted above,
clearly deemed as misleading disclosures in the OCs by virtue of the failure to completely
disclose the then known quality of the underlying collateral. As this Court recently noted in
denying a motion to dismiss in a similar proceeding involving a structured financial product,
"[i]f Plaintiff's allegations are true and the Defendant actually contends that it was proper to
procure the ratings regardless of the material provided it rivals much of the immorality to which
we have all been privy in recent days. It presages a win at any price society, with more than a
dollop of cupidity." *Assured Guar. Municipal Corp. v. UBS Real Estate Sec., Inc.,* No. 12 CV
1579 (HB), 2012 WL 3525613 at *5 (S.D.N.Y. Aug. 15, 2012).[15]

---

[15] Moreover, Defendants provided numerous disclosures about the structure and resulting risks of the CDO
investments in the OCs, but entirely failed to disclose the specific information known to it about the misrated and
toxic investments that they actually were.  This gave rise to a duty of full and complete disclosure, which simply
was not provided. *See Scharf v. Tiegerman,* 166 A.D.2d 697, 697-98, 561 N.Y.S. 2d 271 (2d Dep't 1990)
(representation was only as "good as far as it [went]" and was "accompanied with such a suppression of facts as
[made] it convey a misleading impression" . . . . By making such a representation, the sellers had an affirmative duty
to disclose any material facts relating to the substance of the representation which "might affect the recipient's

### 2.  Plaintiff Has Adequately Pled Reliance

Reasonable reliance requires the duty to investigate an investment opportunity where the plaintiff "was placed on guard or practically faced with the facts. Only [w]hen matters are held to be peculiarly within defendant's knowledge [ ] [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth." *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir. 2006)(citation omitted). A plaintiff has to make allegations indicating "that its reliance on the alleged misrepresentations was not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility." *Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 500 F.3d 171, 182 (2d Cir. 2007). "[W]hether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." *Maloul v. Berkowitz,* No. 07 Civ. 8525, 2008 WL 2876532 at *2 (S.D.N.Y. July 23, 2008). *See also Dandong,* 2011 WL 5170293 at *13; *DDJ Mgmt., LLC v. Rhone Group, L.L.C.,* 15 N.Y.3d 147, 154, 931 N.E.2d 87, 905 N.Y.S.2d 118 (N.Y. 2010).

Here, as noted above, Woori repeatedly pled reliance on RBS and its reputation. Woori asserts that it was not a "sophisticated investor" with respect to CDOs. RBS argues that this position is barred by statements in OCs that it relied on its own judgment and the views of its advisors and that it did not discharge its duty of inquiry. Defs' Mem., pp. 26-29. In support of

conduct in the transaction in hand") (citations omitted); *Sheridan Drive-in, Inc. v. State,* 16 A.D.2d 400, 408, 228 N.Y.S. 2d 576 (4th Dep't 1962) ("[i]f the State's agents knew that so-called 'final' plans were 'frequently changed' and did not disclose this to the claimant's attorney when they stated that the plans were 'final,' they were chargeable with having consciously misled the claimant's attorney by stating what they knew to be a half-truth. This constituted fraud."); *Von Au v. Magenheimer,* 126 A.D. 257, 260-61, 110 N.Y.S. 629 (2d Dep't. 1908) ("[t]he law does not suffer deceit to be practiced by any trick or device. The defendants at least owed the plaintiff the duty to speak the whole truth, if they spoke at all, not literally in words, but truthfully in substance. When they undertook to explain the condition of the company they were bound not to deceive her either by the suppression of the truth or by making statements which, though literally true, were calculated to deceive. They are to be judged by what they intentionally induced her to think, not by what they literally said.").

this argument, it relies on *Landesbank-Baden-Wurttemberg v. Goldman Sachs & Co.*, No. 11-4443, 2012 WL 1352590 (2d Cir. Apr. 19, 2012). Defs Mem., p. 28. That citation is inappropriate. *See, e.g., Williams v. City of New York*, No. 05 Civ. 10230 (SAS), 2007 WL 2214390 at *12 n.178 (S.D.N.Y. July 26, 2007) (citing Local Rule 32.1 and holding that because a Second Circuit decision was a "summary order, it does not have precedential effect"). The trial court opinion in *Landesbank*, upon which Defendants also rely, has been distinguished based on the specificity of the averments in the complaint. *Dodona*, 847 F. Supp. 2d at 643. .

RBS also relies on *HSH Nordbank AG v. UBS, AG*, 95 A.D.3d 185, 941 N.Y.S.2d 59 (1st Dep't 2012) ("*HSH*"). Defs' Mem., pp. 27, 28 n. 4. However, *HSH* is a decision that should be confined to its specific facts. The complaint in that case (available at 2008 WL 5691888) contained nothing similar to the types of assertions of internal misconduct alleged by Plaintiff. Indeed, *HSH* concerned a transaction that occurred in March 2002, which was a very different era in CDO structuring, and certainly well before the time that Woori alleges that RBS systematically abandoned its underwriting standards and improperly pressured the ratings agencies to provide knowingly false ratings.[16] As noted above, these types of internal misconduct were within the Defendants' "peculiar knowledge" of facts underlying the fraud that could not have been discerned by Woori through any investigation of the public record. Courts in this district have noted that "[w]here, as here, the defendant is alleged to have withheld facts about its own transactions, the plaintiff's lack of ready access to that information is presumed." *Nomura Sec. Intern., Inc. v. E\*Trade Sec., Inc.*, 280 F. Supp. 2d 184, 206 (S.D.N.Y. 2003) (*citing Doehla v. Wathne, Ltd.*, No. 98 Civ. 6087, 1999 WL 566311 at *16 (S.D.N.Y. Aug. 3, 1999) ("[b]y its nature, this information is of the type that was in defendants' possession, not at [plaintiff's]

---

[16] As noted in the Complaint, RBS became aware of problems with asset quality in 2005-06. *See e.g.* Compl., ¶54 *et seq.*

fingertips, and which, one can envision, defendants would have desired to keep close to the chest. It takes no great leap of logic to infer from the complaint's allegations that the information was not equally accessible to both plaintiff and defendants, despite the lack of allegations precisely addressing that question."). *See Wedbush Morgan Sec., Inc. v. Robert W. Baird & Co.*, 320 F. Supp. 2d 123, 130 (S.D.N.Y. 2004).

The court in *HSH* distinguished *China Bank* and *MBIA I* on this ground, noting that in those cases (like this one) the facts were within the "peculiar knowledge" of Defendants. 941 N.Y.S.2d at 75 n.15. Similarly, in *ACA*, the court distinguished *HSH* because the claim involved affirmative misconduct that was (as here) known only to defendants that was (as here) the subject of a governmental inquiry. *See also Viking*, 2012 WL 3640684 at *7 (distinguishing *HSH* where the plaintiff uses whatever means of verification are available to it).

The point to be emphasized is that just because one is a "sophisticated investor" does not deprive one from advancing a fraud claim. As Judge Marrero said in *Dodona*:

> However, even assuming that Dodona is sophisticated, it is unclear to the Court whether "the information necessary to unmask the alleged fraud [would] have been accessible to the sophisticated party through minimal diligence." The public information that Defendants point out, such as individual SEC filings for each of the eighty or more referenced RMBS, seems like it would require much more than "minimal diligence" to analyze—even for a sophisticated investor. "Defendants have proffered nothing to suggest that investors were placed on guard about anything approximating the alleged fraud, that they were practically faced with the facts, or that they had access to truth-revealing information." *Dandong*, 2011 WL 5170293, at *14 (internal quotation marks omitted) ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that [the defendant] would select inherently risky underlying assets and short them.") Based on the allegations in the Complaint, whether Dodona was sophisticated and whether it should have uncovered the alleged fraud at the time of the investment using public information are questions of fact. Thus, prior to discovery, the Court will not hazard a guess regarding Dodona's level of sophistication or the import of publicly available information.

847 F. Supp. 2d at 649.

### 3. **Plaintiff Has Adequately Pled *Scienter*.**

*Scienter* can be established by pleading facts indicating that defendant possessed an intent to deceive, manipulate or defraud; such an intent can be established either by pleading "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Abu Dhabi*, 651 F. Supp. 2d at 171 (citing *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) ("*Kalnit*")). *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006). "Adequately pleading '[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged,' while adequately pleading 'opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.'" *Abu Dhabi*, 651 F. Supp. 2d at 171 (quoting *Shields v. Cititrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).[17] Defendants assert that motive has not been alleged adequately. Defs' Mem., pp. 29-33. They are wrong.

Opportunity is readily established here. As said in *Dodona*, "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer." 847 F. Supp. 2d at 638 (citing *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008)).[18] Here, the creation of RMBS by RBS and the use of it as collateral for CDOs also created by RBS provided the requisite opportunity. Motive is also present. As alleged in the Complaint, RBS made many types of fees from its roles as arranger, placement agent, marketer

---

[17] "*[S]cienter* need not be alleged with great specificity, [but] plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). *Scienter*, of course, "is generally a question of fact, appropriate for resolution by the trier of fact." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999). We must, therefore, be "lenient in allowing *scienter* issues to withstand summary judgment based on fairly tenuous inferences." *Meijer, Inc. v. Ferring B. V.*, 585 F.3d 677, 693 (2d Cir.2009) (internal quotation marks and citation omitted). Likewise, under New York Law, "[t]he element of *scienter* ... is, of course, the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof ... [thus] it should be sufficient that the complaint contains some rational basis for inferring that the alleged misrepresentation was knowingly made." *Houbigant, Inc. v Deloitte & Touche, LLP*, 303 A.D.2d 92, 98, 753 N.Y.S.2d 493, 498 (1st Dep't 2003).

[18] One court has noted that "[r]egarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006).

and underwriter of RMBS and CDOs. CDOs were a highly profitable business for it. *See* Compl.,
¶33; *Abu Dhabi*, 651 F. Supp. 2d at 179-80 (indicating that earning of transactional fees
established motive). That business could only be furthered and expanded by loosening or even
ignoring its loan underwriting requirements and pressuring rating agencies to give false ratings.

In the alternative, the behavior by RBS outlined in the Complaint at least amounts to
strong circumstantial evidence of recklessness. A complaint specifically pleads *scienter* when a
defendant has knowledge of facts or access to information that contradicts its public statements.
*Dodona*, 847 F. Supp. 2d at 638. The Complaint adequately alleges such "peculiar knowledge"
here.

### D.   Plaintiff Has Adequately Pled Negligent Misrepresentation

Plaintiff has also alleged a claim for negligent misrepresentation. The elements of a cause
of action for negligent misrepresentation are: (1) awareness by the maker of a statement that the
statement is to be used for a particular purpose; (2) reliance by a known party on the statement in
furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the
relying party and evincing its understanding of that reliance. *Sec. Investor Protection Corp. v.*
*BDO Seidman LLP*, 95 N.Y.2d 702, 711, 723 N.Y.S.2d 750, 756, 746 N.E.2d 1042, 1048 (2001);
*Parrott v. Coopers & Lybrand LLP*, 95 N.Y.2d 479, 484, 718 N.Y.S.2d 709, 711, 741 N.E.2d
506, 508 (2000). To determine reliance, New York courts assess: (1) "whether the person
making the representation held or appeared to hold unique or special expertise"; (2) "whether a
special relationship of trust or confidence existed between the parties"; and (3) "whether the
speaker was aware of the use to which the information would be put and supplied it for that
purpose." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263-64, 652 N.Y.S.2d 715, 675 N.E.2d 450
(1996) ("*Kimmell*"). *See Sogeti USA LLC v. Whirlwind Bldg. Sys., Inc.*, 274 Fed.Appx. 105, 108-

09 (2d Cir. 2008). A "sparsely pled special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where the complaint emphatically alleges the other two factors enunciated in *Kimmell*." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001) ("*Suez*").

Defendants claim that no special relationship exists. Defs' Mem., pp. 33-34. For the reasons explained by Woori in the previous sections of this brief and in its Complaint (*see* Compl. ¶43), they are incorrect.

There is case-law supporting Plaintiff's position. In *KC II*, for example, investors in an SIV sued Morgan Stanley, IKB Credit Asset Management GmbH ("IKB") and various ratings agencies on a theory of negligent misrepresentation. They alleged that the ratings were false and misleading and that Morgan Stanley worked with the ratings agencies to obtain falsely inflated ratings. Judge Scheindlin found that a special relationship existed between the ratings agencies and plaintiffs because the credit ratings at issue were used in documents sent to a select group of investors, those ratings were intended to evaluate the SIV at issue, and they were prepared to induce investment in the SIV.[19] 2012 WL 1592193 at *10-*11 (citing *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1093-95 (S.D.N.Y. 1996)). The district court also upheld negligent misrepresentation claims against Morgan Stanley and IKB based on the same conduct. It found that both knew that ratings would be used by potential investors to make investment decisions, both created the securities in question for a defined group of qualified investors, and both "created and structured [the SIV], worked with the Rating Agencies to ensure that the Rated Notes received falsely-high ratings, and communicated those inaccurate ratings to a select group of qualified investors including the plaintiffs." *KC II*, 2012 WL 1592193 at *12.

---

[19] The investors have subsequently dismissed the negligent misrepresentation claim against the ratings agencies for reasons that are not relevant here.

Another relevant case is *Space Coast Credit Union v. Barclay's Capital, Inc.*, No. 11 Civ.

2802(LLS), 2012 WL 946832 (S.D.N.Y. March 20, 2012), a case in which a negligent

misrepresentation claim relating to CDO investments was held to survive a motion to dismiss.

Judge Stanton held:

> Plaintiff's allegation that "SSGA [State Street Global Advisors, a collateral
> manager alleged to have knowingly allowed Barclay's Capital, Inc. to fill a CDO
> with collateral that would cause it to fail] had superior access to information and
> knowledge as to who had been responsible for selecting such collateral, the true
> quality and value of the collateral portfolio, and superior access to information and
> knowledge as an expert concerning the actual risk of default for the assets in the
> portfolio," Compl. ¶ 446, is sufficient to create a plausible inference that SSGA
> owed a duty to Eastern Financial [plaintiff's predecessor and a sophisticated
> investor] not to act negligently. *See Kimmell v. Schaefer,* 89 N.Y.2d 257, 263, 652
> N.Y.S.2d 715, 675 N.E.2d, 450, 454 (1996) ("liability for negligent
> misrepresentation has been imposed only on those persons who possess unique or
> specialized expertise, or who are in a special position of confidence and trust").
> Whether such a duty actually existed depends on the facts. *See id.* ("whether a
> particular defendant owes a duty to a particular plaintiff is a question of fact").
> Likewise, "Whether the nature and caliber of the relationship between the parties is
> such that the injured party's reliance on a negligent misrepresentation is justified
> generally raises an issue of fact." *Id.* at 264, 652 N.Y.S.2d 715, 675 N.E.2d at 454.
>
> Dismissal of plaintiff's negligent misrepresentation claim (count 7) at the pleading
> stage is thus inappropriate.

2012 WL 946832 at *2-*3.[20] Here, Plaintiff has also alleged that RBS had a special expertise on

which it reasonably relied. Its negligent misrepresentation claim should be sustained.

---

[20] *See also Suez,* 250 F.3d 87, 103-04  (despite a special relationship of trust being sparsely pled, the Court found
that the other two factors in *Kimmell* were alleged strongly enough to overcome a motion to dismiss: that defendants
"appeared to possess—and held themselves out as possessing—special knowledge" and that "defendants knew that
plaintiffs sought information...to aid their investment decision and defendants supplied it for that purpose"); *Wells
Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.,* 247 F. Supp. 2d 352, 367 (S.D.N.Y. 2002) ("[s]ince the
determination of whether a special relationship exists is essentially a factual inquiry, we will assume for present
purposes that these somewhat sparse allegations suffice, at least at the pleading stage, to survive a motion to
dismiss"); *Century Pac., Inc. v. Hilton Hotels Corp.,* No. 03 Civ. 8258, 2004 WL 868211 at *8 (S.D.N.Y. Apr. 21,
2004) (finding special relationship was adequately pled after recognizing that courts have found a special
relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by
making certain statements or providing specific information with the intent that plaintiffs rely on those statements or
information).

### E.    Plaintiff Has Adequately Pled Unjust Enrichment

Finally, Plaintiff has pled a claim for unjust enrichment. To state a claim for unjust enrichment under New York law, a plaintiff must adequately allege "'(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir.2009) (citation omitted).

Defendants contend that this claim is barred because of the existence of an express contract. Defs' Mem., p. 34. However, the Complaint makes no mention of any written contract between Plaintiff and RBS and the OCs cannot be read to function as one. Judge Marrero made this point in *Dodona*:

> And although there is some indication in the Offering Circulars that those who purchased the Hudson CDO securities would be required to do so pursuant to written agreements, the Complaint contains no allegations regarding any written contract. While the Court anticipates that a contract will materialize during discovery, at this stage of the proceedings, Dodona has properly pled unjust enrichment.

847 F. Supp. 2d at 653.

## IV.    CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be denied. If the Court is otherwise inclined to dismiss any of Plaintiff's claims, Woori requests that it be given an opportunity to amend the Complaint.[21]

DATED: September 28, 2012            Respectfully submitted:

                                     HAUSFELD LLP


                                     */s/Christopher L. Lebsock*
                                     Christopher L. Lebsock
                                     *Attorneys for Plaintiff*

---

[21] *See* Fed. R. Civ. P. 15(a)(2); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 199 (2d Cir. 1999) ("dismissal of the amended complaint without leave to amend was an abuse of discretion"); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 454 (S.D.N.Y. 2008) ("[w]hen a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit plaintiff to replead his or her case.").

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was delivered to counsel of record in accordance with the Federal Rules of Civil Procedure via the CM/ECF system upon the filing hereof on this 28th day of September, 2012.

Dated: September 28, 2012          By:          */s/ Christopher L. Lebsock*
                                             Christopher L. Lebsock
                                             HAUSFELD LLP
                                             44 Montgomery Street, Suite 3400
                                             San Francisco, CA 94104
                                             Telephone: (415) 633-1908
                                             Facsimile: (415) 358-4980